J-A18001-19

**NON-PR2ECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ZACHERY LAMAR THREATS | : | |
| | : | |
| Appellant | : | No. 256 WDA 2017 |

Appeal from the Judgment of Sentence January 17, 2017
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0012686-2014

BEFORE: BOWES, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                          **FILED JANUARY 29, 2020**

Zachary Lamar Threats appeals from his January 17, 2017 judgment of sentence after a jury found him guilty of first-degree murder, burglary, and carrying a firearm without a license, which is a violation of the Pennsylvania Uniform Firearms Act ("VUFA"). We affirm.

The trial court offered the following summary of the facts of this case:

On July 4, 2014, Dionna Palmer ("Ms. Palmer") was at her residence at 7710 Tioga Street in the Homewood section of the City of Pittsburgh at approximately 3:00 p.m. She had just returned home from work and was about to enjoy the Fourth of July holiday with her fiancé and family. Ms. Palmer lived at the residence with her fiancé, Kamill Arnold [("Mr. Arnold" or the "victim")], her brother, David Palmer ("Mr. Palmer"), her daughter, mother and her stepfather. Mr. Arnold was in the back yard of the residence cooking on the grill. . . . Mr. Arnold completed grilling some meat and took a tray of grilled meat into the house. Ms. Palmer followed him inside . . . . As she put [a] pot on the stove, she turned to her left to speak with Mr. Arnold. At that point, she observed [Appellant] storm through the back door of the residence, wielding a firearm. [Appellant] faced Mr.

Arnold and shot [him] one time. After Mr. Arnold fell to the floor, [Appellant] stood over [him] and shot him again. [Appellant] then pulled his t-shirt up and tried to cover his face. [Appellant] then ran through the house and fled out the front door. Ms. Palmer attended to Mr. Arnold who was bleeding very badly.

[Contemporaneously,] Mr. Palmer [also] observed [Appellant] rush through the rear door of the residence, raise a firearm and shoot Mr. Arnold. Instinctively, Mr. Palmer dropped to the floor. A few seconds later, he heard another shot. He then observed [Appellant] run through the house and flee. Mr. Palmer then called the police.

On July 5, 2014, the day after the shooting, Ms. Palmer and her brother met with detectives. Ms. Palmer told detectives she had never seen the shooter before the shooting. Ms. Palmer and Mr. Palmer were each shown a photo array in an effort to identify the shooter. [Appellant's] photo was not in the photo array and neither Ms. Palmer nor Mr. Palmer could identify anyone in the photo array. After viewing the photo array, Ms. Palmer advised detectives that her brother had heard that a person with the nickname "Ouga" may have been responsible for the shooting.[1] Detectives accessed a Bureau of Police database and searched that nickname. The search returned a result for [Appellant]. [Appellant's] photo was placed in a second photo array. Ms. Palmer and Mr. Palmer were separately shown the second photo array and they each independently identified [Appellant] as the shooter.

---

[1] Mr. Palmer testified that he believed he first heard the name "Ouga" after [Appellant's] photograph appeared on the news a few days after the shooting. The defense claimed that references to "Ouga" should not have been permitted at trial because Ms. Palmer said her brother told her about that nickname on July 5, 2014[,] but her brother testified that he only learned of that nickname after that date. . . .

During the investigation, detectives learned that a few days before the shooting, Ms. Palmer went to a public housing complex in the City of Pittsburgh, (which she believed was "Northview Heights"), with the victim. Ms. Palmer knew the victim was a "street" person and she was concerned about his activities. Despite her concerns,

she went with the victim to Northview Heights. When they arrived at Northview Heights, the victim parked the car. Ms. Palmer sat in the rear passenger seat of their vehicle due to her concern about the reasons for the trip. She watched the victim exit the vehicle and climb a set of stairs to meet with [Appellant]. It was the first time she had ever seen [Appellant]. She testified that she was clearly able to see [Appellant's] face. After a brief meeting, the victim returned to the vehicle. Ms. Palmer and the victim left Northview Heights and traveled to a Wine & Spirits store. As the victim got out of the vehicle, the victim said aloud to Ms. Palmer, "Fuck that nigga, I'm keeping his money." The victim went into the store and returned with liquor and he had some money in his hand. Ms. Palmer initially did not inform the police officers about this incident due to fear of retribution. At pretrial hearings, Ms. Palmer even testified falsely under oath that she had never seen [Appellant] prior to the day of the shooting. At trial, she recanted her false testimony and testified about the Northview Heights incident and testified that she saw [Appellant] on that date with the victim. She was vigorously cross-examined at trial by the defense over the fact that was an admitted perjurer. . . .

Christina Jackson testified that [Appellant] had stayed with her at her residence during July of 2014. She testified that she had a conversation with [Appellant] during this time in which [Appellant] told her that someone had robbed him and he was going to get his money back on the Fourth of July.

Robert Best testified that he was with [Appellant] on one day in July of 2014. On that day, he and [Appellant] were watching television and [Appellant's] photograph appeared during a story on the local news. When Mr. Best asked [Appellant] what had happened, [Appellant] told him that he went to a cookout on the Fourth of July. [Appellant] claimed that someone tried to rob him and they "tussled." [Appellant] also told Mr. Best that a gun fell to the floor while the two men fought and [Appellant] picked up the gun and shot the other person.

Detective Judd Emery testified that he interviewed [Appellant] after providing him *Miranda* warnings. [Appellant] told Detective Emery that he went to the victim's residence to purchase drugs along with an acquaintance, "Gangster Blizz," to consummate a drug deal. He explained that when he arrived at the victim's residence, a large black male put a gun to his head and tried to

rob him. At that point, Gangster Blizz wielded a gun and shot the victim. The two men then fled the residence. . . .

Trial Court Opinion, 1/22/18, at 1-5.

After a jury trial, Appellant was found guilty of first-degree murder, burglary, and VUFA. On January 17, 2017, the trial court sentenced Appellant to a mandatory term of life imprisonment with respect to his first-degree murder conviction, a consecutive term of ten to twenty years of imprisonment with respect to burglary, and no further punishment relative to Appellant's VUFA conviction. Appellant filed a post-sentence motion seeking a new trial claiming, *inter alia*, that the jury's verdict was against the weight of evidence. The trial court denied it on January 23, 2017.

Appellant filed a timely, counseled notice of appeal. On February 21, 2017, Appellant was directed to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Despite being given a significant extension, it appears from the certified record that Appellant's initial appellate counsel filed Appellant's Rule 1925(b) statement more than two months late.[1]

_____

[1] Although Appellant's first Rule 1925(b) statement was untimely filed, Appellant was represented by counsel. Such an oversight is *per se* ineffective assistance of counsel. ***See Commonwealth v. Burton***, 973 A.2d 428, 433 (Pa.Super. 2009) ("[W]e treat the late filing of the 1925 concise statement as the equivalent of the failure to file such a statement."). The Rules of Appellate Procedure would typically call for remand in such a situation. ***See*** Pa.R.A.P. 1925(c)(3). However, remand is not necessary in this case because Appellant ultimately was given an opportunity to file an amended Rule 1925(b) statement in this case, and the trial court filed its Rule 1925(a) opinion. As such, we will address the merits of Appellant's case. ***See Burton***, ***supra*** at

The trial court filed an initial Rule 1925(a) opinion. While still represented by counsel, Appellant filed a *pro se* application styled as a "Motion to Waive Counsel and Request to Represent Himself." A copy of this filing was forwarded to Appellant's counsel pursuant to **Commonwealth v. Jette**, 23 A.3d 1032, 1044 (Pa. 2011), who supported the basis for Appellant's request, and this Court remanded the case to the trial court for a hearing pursuant to **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998).

Ultimately, the trial court appointed new appellate counsel,[2] and the case was returned to this Court. However, Appellant's newly appointed counsel requested a second remand to the trial court in order to amend the issues raised in Appellant's first Rule 1925(b) concise statement. This Court granted the request and permitted Appellant to file an amended Rule 1925(b) statement and the trial court filed an updated Rule 1925(a) opinion. Appellant has raised the following issues for our consideration, which we have re-ordered for ease of disposition:

_____

433 ("[I]f there has been an untimely filing, this Court may decide the appeal on the merits if the trial court had adequate opportunity to prepare an opinion addressing the issues being raised on appeal.").

[2] While the case was on remand for a **Grazier** hearing, Appellant sent a letter to appellate counsel threatening him and his family with significant violence if he remained on the case. **See** "Exhibit A," Petition to Withdraw as Counsel, 3/20/18. In open court, Appellant repeated these threats. **See** N.T. Hearing, 3/21/18, at 10-11 ("I am not intimidating, I just said if you don't get off the case I am going to have somebody shoot him or his family."). The trial court granted appellate counsel's request to withdraw and appointed the Office of Conflict Counsel to represent Appellant.

1. Whether the Trial Court erred when it failed to exclude [Ms. Palmer's] testimony regarding the alleged drug deal that occurred prior to the shooting?

2. Whether the Trial Court erred when it denied [Appellant's] pretrial motion to suppress his statement to the police, the motion for reconsideration, and the motion to amend, when the Commonwealth failed to demonstrate that [Appellant's] Fifth and Sixth Amendment rights were not violated?

3. Whether the Trial Court erred when it denied [Appellant's] petitions for additional discovery and motion *in limine*, as a violation of **Brady v. Maryland**[, 373 U.S. 83 (1963)] and the Best Evidence Rule?

4. Whether the Trial Court erred when it denied [Appellant's] request for a mistrial after Detective Shaw's testimony?

5. Whether the verdict was against the weight of the evidence to convict [Appellant] of First Degree Murder?

Appellant's brief at 3.

Appellant's first issue asserts that the trial court erred in failing to suppress Ms. Palmer's testimony concerning the financial transaction between Appellant and the victim that transpired before the shooting. In particular, Appellant objects to Ms. Palmer's testimony recounting that the victim said he was "keeping" Appellant's money. Appellant contends that the trial court should have excluded this testimony as unfairly prejudicial pursuant to Pa.R.E. 403 ("The court may exclude relevant evidence if its probative value is outweighed by a danger of . . . unfair prejudice . . . .") and as inadmissible hearsay. *See* Pa.R.E. 802 ("Hearsay is not admissible except as provided by [the Pennsylvania Rules of Evidence], by other rules prescribed by the Pennsylvania Supreme Court, or by statute."). Although presented as a single

issue, this claim essentially involves two separate allegations, namely: (1) that Ms. Palmer's testimony regarding this financial transaction was unduly prejudicial because, according to Appellant, it "heavily indicates that [Appellant and the victim] were involved in some type of illegal activity;" and (2) that Ms. Palmer's recitation of the victim's statement regarding Appellant's money was inadmissible hearsay that allegedly "was entered into evidence to show that some illegal activity occurred between [the victim and Appellant] prior to [the victim's] death." Appellant's brief at 19. In our view, neither claim entitles Appellant to relief.

Appellant is challenging the trial court's evidentiary rulings.[3] As a general matter, "[a]ppellate courts review evidentiary decisions for an abuse of discretion." *Commonwealth v. Jacoby*, 170 A.3d 1065, 1090 (Pa.Super. 2017). In this context, "[a]n abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of

_____

[3] The Commonwealth argues that Appellant has waived these claims by failing to include citations to the record enumerating where in the record Appellant's objection to the inclusion of this evidence was noted in conformity with Pa.R.A.P. 2117(c). However, this oversight by Appellant has not hampered or precluded meaningful appellate review and, thus, we decline to find that Appellant has waived these claims. *See Roseberry Life Ins. Co. v. Zoning Hearing Bd. of City of McKeesport*, 664 A.2d 688, 693 n.7 (Pa.Cmwlth. 1995); *see also Petow v. Warehime*, 996 A.2d 1083, 1088 n.1 (Pa.Super. 2010) (holding that the decisions of the Commonwealth Court "provide persuasive authority" and providing that this Court "may turn to our colleagues on the Commonwealth Court for guidance when appropriate").

partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." ***Id***. With respect to the specific issue raised by Appellant, we note that Pennsylvania courts are not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." ***Commonwealth v. Lark***, 543 A.2d 491, 501 (Pa. 1988).

As an initial matter, Appellant is mistaken in claiming that this evidence was offered by the Commonwealth to establish additional criminal behavior on the part of either Appellant or the victim. Our review of Ms. Palmer's testimony indicates that she made no such explicit statement to that effect.[4] ***See*** N.T. Trial, 1/11/17, at 247-52. To the contrary, her testimony indicated that she was not aware of the ultimate object of the transaction. ***Id***. Even assuming, *arguendo*, that Ms. Palmer **had** stated that the at-issue transaction concerned an illegal purpose, the admission of Ms. Palmer's testimony directly spoke to Appellant's motive and intent in killing the victim. ***See*** Pa.R.E. 404(b)(1)-(2) (stating that evidence of "a crime, wrong, or other act . . . may

---

[4] Although Ms. Palmer did not insinuate that Appellant and the victim had been engaged in a narcotics transaction, other testimony from the Commonwealth's witnesses did so attest. In particular, one of the Pittsburgh Police Department detectives who interviewed Appellant on August 12, 2014, testified that Appellant freely admitted during his interrogation that he had conducted a "drug deal" with the victim "a couple of days prior to the homicide." ***See*** N.T. Trial, 1/12/17, at 371-72.

be admissible" for the purposes of proving motive or intent"). In this instance, the probative value of this evidence concerning Appellant's financial activities that were allegedly related to narcotics outweighed any potential prejudicial effect. *See Commonwealth v. Malloy*, 856 A.2d 767, 776 (Pa. 2004) (holding evidence of prior "drug-related activity" was admissible under Rule 404(b)(2) to demonstrate motive and "to show that this killing did not occur in a vacuum"); *see also Commonwealth v. Hall*, 565 A.2d 144, 149 (Pa. 1989) (same).

Furthermore, Appellant's arguments regarding hearsay are similarly meritless. Instantly, the trial court permitted this testimony pursuant to a well-recognized exception to the rule against hearsay codified at Pa.R.E. 803(3) (permitting the admission of hearsay evidence where it is "[a] statement of the declarant's then-existing state of mine (such as motive, intent or plan)"). *See* Trial Court Opinion, 1/22/18, at 9-10. As discussed above, the victim's statement was indicative of Appellant's motive in shooting the victim and, therefore, was properly admitted under Rule 803(3). *See Commonwealth v. Puskar*, 740 A.2d 219, 225 (Pa. 1999) (holding that out-of-court statement of victim that he would not pay defendant back for a model train set was admissible to establish motive for murder).

Overall, we discern no abuse of discretion or error of law in the trial court's rulings and no relief is due.

Appellant's second issue concerns the trial court's denial of his motion wherein to suppress various incriminating statements that he made to Pittsburgh Police Department detectives while he was being interrogated on August 12, 2014, and after he signed a **Miranda** waiver.[5] Appellant made three separate attempts to exclude these statements by filing: (1) a motion to suppress arguing that he was too intoxicated to knowingly and voluntarily waive his **Miranda** rights, **see** Motion to Suppress, 1/11/16, at 1; (2) a motion for reconsideration of his motion to suppress on the grounds that the detectives had ignored Appellant's request for legal representation during the interrogation, **see** Motion for Reconsideration, 7/22/16, at 1-5; and (3) an

_____

[5] No audio or video transcript of Appellant's August 12, 2014 interrogation was created. The precise contours of these incriminating statements are disputed by the parties and Appellant has not specifically identified which statements he wishes to exclude from the record. Looking to the certified record, it appears that trial testimony from one of the Pittsburgh Police Department detectives who interviewed Appellant is the best exemplar. **See** N.T. Trial, 1/12/17, at 371-77. In pertinent part, this testimony established that Appellant: (1) admitted he knew the victim and had engaged in a "drug deal" with the victim a few days prior to the shooting; (2) described the shooting in great detail prior to being provided with any salient details of the crime; and (3) was aware of the warrant for his arrest in relation to the instant homicide prior to being arrested. **Id**. at 371-72, 375-76. Additionally, the detective testified that Appellant stated that the victim's July 4, 2014 murder was actually the result of a failed drug deal, and that an individual named "Gangster Bizz" had killed the victim. **Id**. at 374-75. Following this initial interview, Appellant was interrogated by a second detective. This interrogation was recorded and was played for the trial court while it was considering Appellant's arguments regarding suppression prior to trial. **See** N.T. Hearing, 1/10/17, at 55, 104-05 (noting Appellant's "very calm voluntary demeanor answering incriminating questions with incriminating answers" and that he never definitively requested to speak with his attorney).

amended motion to suppress arguing that the detectives were fully aware that Appellant was represented by an attorney at the time of the interrogation, and that the detectives had ignored his request to speak with counsel. **See** Amended Motion to Suppress, 12/21/16, at 1-2. Before this Court, Appellant has focused his arguments[6] upon the denial of his alleged requests to speak with his then-attorney, Casey White, Esquire. Appellant asserts that his rights to counsel and against self-incrimination under the Fifth and Sixth

---

[6] To the extent that Appellant relies upon his alleged intoxication in support of this argument, we conclude that he has not sufficiently demonstrated that he was so intoxicated that he was unable to comprehend the **Miranda** warnings provided by the officers. **See Commonwealth v. Ventura**, 975 A.2d 1128, 1137-38 (Pa.Super. 2009) ("The fact that an accused [is intoxicated] does not automatically invalidate his subsequent incriminating statements. The test is whether he had sufficient mental capacity at the time of giving his statement to know what he was saying and to have voluntarily intended to say it."). Appellant's relevant discussion of this issue is confined to a single sentence without citation to any authoritative legal sources. **See** Appellant's brief at 26 ("Per [Appellant's] own testimony, he was 'rolling,' indicating he was under the influence of drugs at the time of the interrogation, which also indicates that the waiver was not knowing, intelligent, or voluntary."). As such, Appellant is essentially arguing that the mere fact that he alleges intoxication is sufficient, in and of itself, to invalidate his **Miranda** waiver. However, our case law is clear that mere intoxication does not render such a waiver involuntary without a demonstration that Appellant's cognitive awareness was significantly impacted. **See Commonwealth v. Manning**, 435 A.2d 1207, 1210 (Pa. 1981) ("[I]ntoxication is a factor to be considered, but is not sufficient, in and of itself to render the confession involuntary."). No such evidence is present in the certified record, and Appellant cites no support beyond his own testimony. **See** N.T. Hearing, 1/12/16, at 56, 63, 66, 68-69, 71 (testimony from detective indicating Appellant did not appears to be intoxicated at the time of his interview). Even assuming, *arguendo*, that Appellant **was** intoxicated at the time of interrogation, his argument is without merit due to his failure to provide competent argument concerning his allegedly diminished mental capacity at the time of his interrogation.

Amendments of the U.S. Constitution and Article I, § 9 of the Pennsylvania Constitution have been violated as a result. We disagree.

We consider Appellant's arguments mindful of the following principles:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. **Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole.** Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. . . . [T]he suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Hoppert*, 39 A.3d 358, 361-62 (Pa.Super. 2012) (emphasis added, internal quotation marks omitted). We also note that "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Clemens*, 66 A.3d 373, 378 (Pa.Super. 2013).

As a general matter, *Miranda* protects a suspect's "desire to deal with the police only through counsel." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). This right attaches upon custodial interrogation and, once invoked, it prohibits any further questioning of a suspect until counsel is present. *See Arizona v. Roberson*, 486 U.S. 675, 686-87 (1988). Indeed, the United States Supreme Court has stated that once an accused has invoked his right

to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him . . . ." **Edwards v. Arizona**, 451 U.S. 477, 484 (1981). However, the right to counsel must be specifically and unambiguously invoked by the suspect in order to enter into force. **See Davis v. U.S.**, 512 U.S. 452, 459 (1994). The Supreme Court held in **Davis** that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, **Edwards** does not require that the officers stop questioning the suspect." **Id**.

Appellant's argument concedes that he understood and signed the **Miranda** waiver form provided by the Pittsburgh detectives, but claims that he did so only to be able to speak with Attorney White. In his version of events, Appellant characterizes his **Miranda** waiver as a kind of *quid pro quo* that was necessary in order to gain access to his chosen counsel. **See** Appellant's brief at 26 ("[O]ne cannot waive his right to an attorney by signing a form in order to speak with his attorney."). In pertinent part, Appellant maintained before the trial court that he repeatedly requested the opportunity to speak with someone that he referred to only as "Casey" during the interrogation. **See** N.T. Hearing, 1/10/17, at 86 ("I said let me call Casey White. I didn't say White, I said let me call Casey."). Appellant also stated that he never explicitly identified "Casey" as his attorney to the detectives.

*Id*. at 87, 90 ("I said let me call Casey.  I never said lawyer.").  Yet, Appellant maintains that at least one of the detectives should have realized that he was referring to Attorney White as a result of his prior interactions with Appellant. *Id*. at 87-89.  Appellant made general references to his past interactions with the police to establish this alleged prior knowledge.  *Id*. at 86-89.

When pressed, Appellant's only specific factual argument was an unsupported averment that one of the interviewing detectives was "in the hallway" outside of a prior proceeding in the Allegheny County Court of Common Pleas wherein Appellant was represented by Attorney White.  *Id*. at 89.  The same interrogating detective testified at the suppression hearing, and stated that: (1) Appellant had never requested an attorney during the interrogation; and (2) he had no prior knowledge of Appellant's alleged representation by Attorney White.  *Id*. at 39-46.  Based upon this evidence, the trial court concluded that Appellant's account of events was not credible and that he had not sufficiently articulated his request for an attorney.  *Id*. at 104-06 ("I can't accept your testimony as reliable on matters we are here for today for the reasons I've indicated.").

We discern no abuse of discretion or error of law in the trial court's assessment.  Its factual findings are supported in the certified record, and we are accordingly bound by those findings.  *Accord Clemens*, *supra* at 378. Furthermore, we find no abuse of discretion or error of law in the trial court's conclusion that Appellant's ambiguous references to an individual named

"Casey," without more, were insufficient to apprise the interrogating officers that Appellant was requesting the assistance of counsel. *Accord Davis*, *supra* at 461 ("[W]e decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."). No relief is due on this claim.

Appellant's third issue implicates a potential violation under *Brady v. Maryland*, 373 U.S. 83 (1963), which provides that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. During discovery, Appellant made two separate requests for all "handwritten" notes prepared by the investigating detectives. *See* Petition for Additional Discovery, 1/27/15, at ¶ 1; *see also* Petition for Additional Discovery, 12/1/16, at ¶ 1.[7] The Commonwealth disclaimed that such notes existed. *See* Response to Discovery Motion, 2/6/15, at ¶ 1 ("There are no handwritten notes available to turn over to defense."). However, at trial, one of the testifying detectives represented that he had created handwritten notes

---

[7] The December 1, 2016 petition bears all of the hallmarks of being a *pro se* submission, and was denied as such by the trial court. *See* N.T. Hearing, 1/10/17, at 106 ("Petition for additional discovery is denied as filed by [Appellant], not endorse[d] by [trial counsel]."). Appellant's trial counsel later orally adopted the motions and the trial court denied them. *Id*. at 109-10. Consequently, there are no concerns as to hybrid representation.

- 15 -

documenting Appellant's interrogation that **may** still exist, and which were not disclosed to Appellant during discovery. *See* N.T. Trial, 1/12/17, at 384-85. Appellant claims that this alleged error requires a new trial. We disagree.

The legal principles that guide our review in this context have been articulated by our Supreme Court:

> "There are three components of a true *Brady* violation: [t]he evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)
>
> Pursuant to *Brady* and its progeny, the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). However, there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois*, 408 U.S. 786, 795 (1972). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *U.S. v. Agurs*, 427 U.S. 97, 109-10 (1976).

*Commonwealth v. Natividad*, 200 A.3d 11, 25-26 (Pa. 2019).

Appellant's arguments concerning the alleged *Brady* violation in this case are substantially threadbare and overly conclusory regarding the nature of these handwritten notes. As an initial matter, the at-issue testimony from the detective indicates a mere possibility that these notes still exist. Even assuming, *arguendo*, that the Commonwealth can be fairly construed as having "suppressed" this evidence, Appellant has failed to demonstrate that

these notes are actually favorable to his case. In totality, Appellant's argument regarding the alleged favorability of these handwritten notes is nothing more than an unsupported allegation that these notes **might** differ in some material way from the official reports prepared by the Pittsburgh Police Department detectives, citing testimony from the trial. **See** Appellant's brief at 29-30. However, the detective who prepared these handwritten notes testified that there were no such substantive differences between the handwritten notes and the official reports. **See** N.T. Trial, 1/12/17, at 386 (detective testifying that his handwritten notes "correspond" with the official reports). Although not adjudicated under the precise framework of **Brady**, this Court has previously held that even the outright destruction of handwritten notes by police is not "material" to the underlying prosecution where the content of the notes have been "substantively incorporated" into the official report and is merely "cumulative evidence." **Commonwealth v. Pickering**, 533 A.2d 735, 736-37 (Pa.Super. 1987).

Moreover, Appellant has not identified (or even speculated as to) what exculpatory or impeachment information might appear in these handwritten notes. "**Brady** does not require the disclosure of information that is not exculpatory but might merely form the groundwork for possible arguments or defenses." **Commonwealth v. Paddy**, 15 A.3d 431, 450-51 (Pa. 2011). The gravamen of Appellant's argument is simply that these handwritten notes may

have yielded the basis for potential arguments in his defense. Without more, we must conclude that Appellant's third claim also fails.[8] *Id*.

Appellant's fourth claim concerns the trial court's refusal to grant a mistrial following a statement from one of the testifying detectives opining that Appellant is "not allowed to have a gun." *See*, N.T. Trial, 1/12/17, at 401. At the time that he made this statement, the detective was establishing that Appellant was not licensed to carry a concealed firearm. *Id*. Immediately afterward, Appellant requested a mistrial, arguing that this statement created an inference that he had previously been convicted of a felony. *Id*. at 402. The trial court ultimately denied the request, stating that the detective's comment did not explicitly state that Appellant had previously been convicted of a felony. *Id*. at 402-03 ("I don't think it crosses the line. I think it was dangerously close but without any context one could infer that he is not licensed to carry a gun, one could interpret that. The detective didn't add anything to it."). Appellant now alleges that the trial court erred in denying his mistrial motion. *See* Pa.R.Crim.P. 605(b). We disagree.

_____

[8] Appellant has also included an argument that the Commonwealth has violated the "best evidence rule" pursuant to Pa.R.E. 1002 by not producing these handwritten notes. However, Appellant did not raise this issue before the trial court, nor did he seek suppression on these grounds. As such, it has been waived. *See Commonwealth v. Johnson*, 33 A.3d 122, 126 (Pa.Super. 2011) (holding in the context of suppression and discovery that "[i]t is axiomatic that claims not raised in the trial court may not be raised for the first time on appeal."); *see also* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the time on appeal.").

The legal principles undergirding this issue are as follows:

It is well-settled that the review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will . . . discretion is abused. A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict.

*Commonwealth v. Chamberlain*, 30 A.3d 381, 422 (Pa. 2011) (internal citation and quotation marks omitted). With specific reference to testimony from witnesses, we note that "[e]very unwise or irrelevant remark made by a witness during a trial does not compel the granting of a mistrial," which is only necessary "when the remark is so prejudicial that it deprived the defendant of a fair and impartial trial." *Commonwealth v. Rebovich*, 406 A.2d 791, 794 (Pa.Super. 1979).

Here, Appellant's claim is that the testimony could have led the jury to infer that Appellant had previously been convicted of a felony. *See Commonwealth v. Padilla*, 923 A.2d 1189, 1194 (Pa.Super. 2007) (holding that evidence of prior crimes or bad acts may not be presented at trial to establish the defendant's criminal character or proclivities). However, this Court has previously held that "a mere passing reference to . . . prior criminal activity" is not prejudicial such that it requires the granting of a mistrial. *Commonwealth v. Hudson*, 955 A.2d 1031, 1034 (Pa.Super. 2008) (holding

that testimony suggesting that defendant was visiting his probation officer was not prejudicial following a curative instruction).[9]  Even assuming, *arguendo*, that the detective's testimony was objectionable, it was not of an ilk that required the granting of a mistrial.  **See id**.  No relief is due.

Finally, with respect to Appellant's challenge to the weight of the Commonwealth's evidence, Appellant rests his entire argument upon the conflicting testimony of Ms. Palmer and Mr. Palmer and claims that the inconsistencies in their respective testimony, alone, should compel a new trial.  **See** Appellant's brief at 12-13 ("The key witness for the Commonwealth, Dionna Palmer, was an admitted perjurer whose testimony was so tenuous, vague and uncertain that the verdict should shock the conscience of this Court.").  After reviewing the relevant evidence and testimony, we disagree.

Our Supreme Court has clearly delineated the basic standards that guide our review of this claim:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.  **Commonwealth v. Brown**, 648 A.2d 1177, 1189 (Pa. 1994).  Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight

---

[9]  In **Commonwealth v. Hudson**, 955 A.2d 1031, 1034 (Pa.Super. 2008), the trial court issued a curative instruction regarding the objectionable testimony.  Instantly, the trial court offered to issue a curative instruction regarding the detective's testimony discussed above.  However, Appellant declined the trial court's offer.  **See** N.T. Trial, 1/12/2017, at 403.

> of the evidence.  ***Commonwealth v. Farquharson***, 467 Pa. 50, 354 A.2d 545 (Pa.1976).  One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013).  Furthermore, "[a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion."  ***Id***. at 1055 (citing ***Commonwealth v. Widmer***, 744 A.2d 745, 752 (Pa. 2000)).  Rather, a new trial should only be awarded by the trial court when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and where the awarding of a new trial is imperative so that right may be given another opportunity to prevail.  ***Id***. at 1055 (citing ***Brown***, ***supra*** at 1189).

Instantly, Appellant's claim implicates various portions of Ms. Palmer's and Mr. Palmer's testimony, as well as others, including: (1) the differences in Ms. Palmer's testimony between the preliminary hearing (when she testified that she had never seen Appellant before the Fourth of July incident) and her testimony at trial (when she testified that the victim and Appellant had engaged in a financial transaction a few days prior to the Fourth of July incident; (2) minor conflicts in Mr. Palmer's and Mrs. Palmer's testimony concerning the color of Appellant's t-shirt on the day of the incident; (3) minor inconsistencies in Ms. Palmer's testimony regarding how Appellant exited the residence after the shooting; (4) allegations that neither Ms. Palmer nor Mr.

Palmer could have learned Appellant's nickname "Ouga" prior to speaking with law enforcement on July 5, 2014; and (5) testimony from the defense witness Tony Banks indicating that the aforementioned individual "Gangster Bizz" was seen fleeing from the scene of the shooting. *See* Appellant's brief at 12-17.

In sum, Appellant's claims all implicate conflicts in the testimony of the various witnesses presented by Appellant and the Commonwealth, and highlights the opposing narratives presented by the parties at trial. However, "[o]ur law is crystal clear that the trier of fact, in passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence presented." *Commonwealth v. Hopkins*, 747 A.2d 910, 914 (Pa.Super. 2000). "The Superior Court may not reweigh the evidence and substitute our judgment for that of the finder of fact." *Id*. Both Mr. Palmer and Ms. Palmer were subjected to withering cross-examination concerning the above-noted discrepancies, and the jury still chose to credit their version of events above that of Appellant and the defense witnesses. *See* N.T. Trial, 1/11/17, at 260-77, 289-95.

The trial court applied the proper legal standard in evaluating Appellant's claim concerning the weight of the evidence and concluded as follows:

> [The trial court] believes that the jury was free to consider Ms. Palmer's credibility as an admitted perjurer. It obviously did so and accepted her trial testimony as true. Her testimony established the necessary elements that identified [Appellant] as the person who shot and killed [the victim] and she described the circumstances of the shooting. . . . Mr. Palmer's testimony was also probative as he provided information that established that [Appellant] was involved in the offenses of conviction. [The trial

- 22 -

court] has reviewed the trial court record and concludes that there
is nothing about this verdict that shocks any sense of justice.

Trial Court Opinion, 11/20/18, at 7-8. Mere conflicts in the testimony of the Commonwealth's witnesses do not undermine the weight of the evidence against Appellant, particularly where the jury has been provided with ample opportunity to assess those inconsistencies and reach its own determination. *See Commonwealth v. Stiles*, 143 A.3d 968, 980-81 (Pa.Super. 2016) (rejecting arguments that a verdict is against the weight of the evidence based solely upon "various inconsistencies in the testimony and pretrial statements" of Commonwealth witnesses); *see also Commonwealth v. Home*, 89 A.3d 277, 285-86 (Pa.Super. 2014) (same). Our review reveals no abuse of discretion by the trial court. Accordingly, Appellant's final claim also fails.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/29/2020